**IT IS ORDERED as set forth below:**

**Date: March 26, 2018**

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 14-73606-WLH |
| MICHAEL ANTHONY FARR, | CHAPTER 7 |
| Debtor. | |
| GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT AND POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, | ADVERSARY PROCEEDING NO. 16-5325-WLH |
| Plaintiff, | |
| v. | |
| MICHAEL ANTHONY FARR, | |
| Defendant. | |

1

## ORDER GRANTING SUMMARY JUDGMENT

**THIS MATTER** is before the Court on Plaintiffs' Motion for Summary Judgment (the "Motion"). Plaintiffs seek damages for conversion, trebled damages, and a determination those damages are nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Having read and considered the Motion, the Court finds summary judgment is appropriate.

### I.    FACTS

The facts in this case are largely undisputed. Defendant admitted certain facts in his answer to Plaintiffs' amended complaint. He admitted other facts in depositions given under oath.

#### a. Parties

Plaintiffs, the General Retirement System of the City of Detroit ("Detroit GRS") and Police and Fire Retirement System of the City of Detroit ("Detroit PFRS"), are pension plans and trusts that invested funds in a limited partnership, the vast majority of which was lost.

Defendant is the President, Chief Executive Officer, and sole owner of Second Chance Motors, Inc., which sells used vehicles. Defendant also controls two related entities: SCM Credit, LLC, which provides financing to vehicle purchasers, and SCM Finance, LLC, which provides Second Chance Motors dealerships with financing for used vehicle entities (collectively the "Second Chance Entities"). In 2007, Defendant formed Sea Jay, LLC ("Sea Jay"), to purchase real estate and lease it to a Second Chance Motors dealership.

Defendant met Roy L. Dixon, Jr. in 1994. They became friends and began business dealings in the early 2000s. Dixon was a licensed securities broker and the owner and founding member of Onyx Capital, a private equity firm based in Detroit, Michigan. Onyx Capital solicited

2

municipal pension plan investors and managed assets for three Detroit-area public pension funds through its position as the general partner for the Onyx Capital Advisory Fund I, LP (the "Limited Partnership Fund"), a private equity fund. On June 7, 2007, Onyx Capital and Plaintiffs executed a Limited Partnership Agreement pursuant to which Plaintiffs, as limited partners, committed to investing $10 million each in the Limited Partnership Fund. Pontiac GERS later signed on as an additional limited partner.

### b. Transactions

Onyx Capital issued several capital calls to Plaintiffs from June 2007 – April 2009. Plaintiff Detroit GRS contributed $10,000,000; Plaintiff Detroit PFRS contributed $9,945,749. Ultimately, the Limited Partnership Fund invested approximately $20 million in five companies. Of this, approximately 80%, or $15,729,477 went to Second Chance Motors, SCM Finance, and SCM Credit between 2007 and 2009; the other 20% was invested in unrelated companies. More specifically, the Limited Partnership Fund transferred: $1,967,000 to Second Chance Motors; $2,273,000 to SCM Finance, and $11,489,477 to SCM Credit.

The Motion discusses various questionable transactions between and among Onyx Capital, the Limited Partnership Fund, and the Second Chance Entities, but the Motion is based on three categories of transfers.

### i. $730,000.00 Transfer

On September 10, 2007, Defendant withdrew $730,000 of the Limited Partnership Fund investment proceeds Second Chance Motors had received and deposited that amount into his and his wife's personal bank account. Defendant used the money to cure his Michigan condominium mortgage default and to purchase, in Sea Jay's name, property in Marietta, Georgia. Sea Jay then leased the property to Second Chance Motors for it to use as its headquarters. Were it not for this

money, neither Defendant nor the Second Chance Entities would have had enough money to cure Defendant's mortgage default and purchase the Marietta property.

### ii. $513,426.10 Transfer

In 2008, Dixon told Defendant he needed funds to complete the construction of his new home in Atlanta, Georgia, and Dixon asked Defendant to make payments on his behalf to construction contractors. Dixon and Onyx Capital transferred money from the Limited Partnership Fund to the Second Chance Entities purportedly for investment purposes. Defendant knew the money came from investor funds. Defendant then transferred the money from the Second Chance Entities to Sea Jay, which issued checks to pay Dixon's construction contractors. Between October 2008 and December 2008, Defendant wrote checks from Sea Jay's accounts totaling $513,426.10 to three construction companies (Flatstone, SALE, and to Five Star Construction) that performed work on Dixon's house. Defendant testified he had no reservations when he was asked to make the payments, and he completed the favor because Dixon had invested money in Defendant's companies. He transferred the money from the Second Chance Entities to Sea Jay's accounts to issue the checks so the payments would not appear improper. Later, and after the Securities and Exchange Commission (the "SEC") started investigating the Limited Partnership Fund, Defendant executed documents to show Sea Jay had purportedly owed a debt to Dixon at the time of the transfers.

### iii. $373,000.00 Transfer

From December 15 through December 31, 2008, Defendant made several withdrawals from his Sea Jay and Second Chance Motor accounts. Defendant went to several different banks on different dates and withdrew a total of $373,000. He then gave the cash to Dixon, who in turn transferred the cash to the Limited Partnership Fund. Defendant believed all of the cash he

4

withdrew during this period came from the Limited Partnership Fund.

### c. Previous Litigation

In the summer of 2009, the SEC began investigating the Limited Partnership Fund, Dixon, and Defendant. The SEC filed a complaint against Onyx Capital, Dixon, and Defendant alleging eight counts of Securities Act violations. The district court issued a preliminary injunction freezing assets. The SEC sought and obtained summary judgment against Dixon and the Limited Partnership Fund in U.S. Secs. & Exch. Comm'n v. Onyx Capital Advisors LLC, Case No. 10-11633, 2012 U.S. Dist. LEXIS 146388, 2012 WL 4849890 (E.D. Mich. Oct. 11, 2012) (the "District Court Order").

Dixon filed bankruptcy in September 2011, case no. 11-75482. Plaintiffs and Pontiac GERS filed a complaint against Dixon in which they sought a determination the debts owed by Dixon were nondischargeable. The Court entered orders against Dixon in General Retirement Sys. of the City of Detroit v. Dixon (In re Dixon), 525 B.R. 827 (Bankr. N.D. Ga. 2015) ("Dixon I"); and General Retirement Sys. of the City of Detroit v. Dixon (In re Dixon), 535 B.R. 450 (Bankr. N.D. Ga. 2015) ("Dixon II").

### d. Defendant's Bankruptcy and Adversary Proceeding

Defendant filed a petition under chapter 11 of the Bankruptcy Code on December 1, 2014. The case was converted to a chapter 7 case on August 31, 2016. A discharge was entered on June 7, 2017, and the chapter 7 Trustee filed a report of no distribution on October 4, 2017.

Plaintiffs filed the complaint on November 21, 2016, asserting a claim for conversion and treble damages, and seeking a determination those damages are nondischargeable pursuant to sections 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code. Defendant answered the

5

complaint, and Plaintiffs filed a first amended complaint on January 10, 2017. Defendant answered the first amended complaint on April 19, 2017.

Plaintiffs filed the Motion on October 31, 2017. Plaintiffs contend Defendant converted funds in the amounts of $730,000, $513,426.10, and $373,000. Plaintiffs ask the Court to treble the damages and determine the sum to be nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code. Defendant had until November 21, 2017 to respond. He failed to file a response; consequently, the Motion is deemed unopposed pursuant to Local Rule 7007-1(c). Nevertheless, the Court must determine the propriety of granting the motion. Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). Having read and considered the Motion, the Court finds summary judgment is appropriate.

## II. ANALYSIS

### a. Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law". Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056(c). "The substantive law [applicable to the case] will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden of proving there are no disputes as to any material facts. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials

6

in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts to demonstrate there is a genuine dispute over material facts. Hairston, 9 F.3d at 918. When reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. Id.

    b. **Conversion**

Under Michigan law, conversion is "any distinct act of dominion wrongfully asserted over another's personal property." Dixon II, 535 B.R. at 456 (citing Trail Clinic PC v. Bloch, 319 N.W. 2d 638, 640 (Mich. Ct. App. 1982)). "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." Id. (citing Dept. of Agriculture v. Appletree Marketing, LLC, 779 N.W. 2d 237, 244-45 (Mich. 2010)). "[A] person may be guilty of a conversion by actively aiding or abetting or conniving with another in such an act. Indeed, one may be liable for assisting another in a conversion though acting innocently. These rules are especially applicable where the defendant received benefit from the conversion and subsequently approved and adopted it." Id. (citing Trail, 319 N.W. 2d at 641). Under Michigan law, a party not in control may be liable for conversion if the person "actively" aided, abetted or connived or received the benefit of the conversion. Trail, 319 N.W. 2d at 641.

    c. **Treble Damages**

As a general rule, under Michigan law the measure of damages for common law conversion is the fair market value of the property converted at the time of the conversion. In re CMC Telecom, Inc., 383 B.R. 52, 65 (Bankr. E.D. Mich. 2008). Aside from the common law remedy, Michigan, by statute, authorizes treble damages as an additional remedy. Under Michigan law,

7

treble damages are "designed to penalize or punish 'dishonest defendants.'" Hoffenblum v. Hoffenblum, 863 N.W.2d 352, 360 (Mich. App. 2014).

Under Michigan law, MCL 600.2919a, damages for conversion can be trebled. The section provides:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> > (a) Another person's stealing or embezzling property or converting property to the other person's own use.
> >
> > (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Mich. Comp. Laws Serv. § 600.2919a. "Own use" has been defined by the Michigan Court of Appeals as requiring a person "employ for some purpose" the converted property. Dixon II, 535 B.R. at 457 (citing Aroma Wines v. Columbia Distribution Services, 844 N.W. 2d 727, 731 (Mich. App. 2013)). As set forth in the statute, treble damages are awarded *in addition* to other remedies. They are not awarded automatically. Chudzinski v. Hanif (In re Hanif), 530 B.R. 655, 671 (Bankr. E.D. Mich. 2015).

An award of treble damages is discretionary and should be based on what is fair under the circumstances. Dixon II, 535 B.R. 450, 458 (Bankr. N.D. Ga. 2015). In exercising its discretion, a court should consider whether the conversion was willful and malicious. Dixon II, 535 B.R. at 458; *see also* Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC, No. 07-13523, 2009 U.S. Dist. LEXIS 90393, 2009 WL 3199882 at *17 (E.D. Mich. Sept. 30, 2009). Thus, treble damages are

8

appropriate when the wrongdoer intentionally acted willfully and maliciously, and the determination a debt is nondischargeable can be the basis for a court exercising its discretion to treble those damages.  Dixon II, 535 B.R. at 458.

### d.  Willful and Malicious Injury Pursuant to Section 523(a)(6)

Plaintiffs contend its claim for conversion is nondischargeable as a matter of law pursuant to section 523(a)(6) of the Bankruptcy Code.  A presumption exists that all debts owed by the debtor are dischargeable unless the party contending otherwise proves nondischargeability.  11 U.S.C. § 727(b).  The purpose of this "fresh start" is to protect the "honest but unfortunate" debtors.  U.S. v. Fretz (In re Fretz), 244 F.3d 1323, 1326 (11th Cir. 2001).  The burden is on the creditor to prove an exception to discharge by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 287-88 (1991); St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 680 (11th Cir. 1993).  Courts should narrowly construe exceptions to discharge against the creditor and in favor of the debtor.  Equitable Bank v. Miller (In re Miller), 39 F.3d 301 (11th Cir. 1994); St. Laurent, 991 F.2d at 680.

Section 523(a)(6) excepts from discharge an individual's debts incurred by "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Section 523(a)(6) generally relates to torts and "may apply to a broad range of conduct causing harm to people . . . subject to the limitation that the injury be "willful and malicious.'"  4 Alan N. Resnik & Henry J. Sommer, Collier on Bankruptcy ¶ 523.12 (16th ed. 2017).

The term "willful" means intentional and deliberate; "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will."  Lee v. Ikner (In re Ikner), 883 F.2d 986, 991 (11th Cir. 1989); Chrysler Credit Corp. v. Rebhan, 842 F.2d 1257, 1263 (11th Cir. 1998), *abrogated on other grounds by* Grogan v. Garner, 498 U.S. 279

9

(1991); Sunco Sales, Inc. v. Latch (In re Latch), 820 F.2d 1163, 1166 n.4 (11th Cir. 1987). The debtor, through his acts, must have actually intended the injury, not just taken intentional acts which resulted in an injury. Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998). "[A] debtor is responsible for 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." In re Walker, 48 F.3d 1161, 1165 (11th Cir. 1995). Because the term "willful" means intentional and deliberate, it cannot be established merely by applying a recklessness standard. In re Ikner, 883 F.2d at 989. A finding of reckless disregard may be sufficient to establish maliciousness, as it can be implied or constructive. Chrysler Credit Corp., 842 F.2d at 1262-63. Not every intentional tort falls within the gamut of section 523(a)(6). Miller v. J.D. Abrams, Inc. (In re Miller), 156 F.3d 598, 604 (5th Cir. 1998) ("[m]erely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful").

Plaintiffs contend the debt should be deemed nondischargeable because Debtor converted funds. Conversion of property may fall within the section 523(a)(6) exception to discharge. However, neither a breach of contract nor the tort of conversion necessarily involves a willful and malicious injury. Britt's Home Furnishing, Inc. v. Hollowell (In re Hollowell), 242 B.R. 541, 544 (Bankr. N.D. Ga. 1999); cf. Davis v. Aetna Acceptance Co., 293 U.S. 328, 331 (1934) (holding a willful and malicious injury does not automatically result from every tortious conversion). A technical conversion may very well lack the willfulness and maliciousness necessary to except the liability from discharge, and conversion under Michigan law is not *per se* a willful and malicious injury under § 523(a)(6). See McCallum v. Pixley (In re Pixley), 456 B.R. 770 (Bankr. E.D. Mich. 2011). For a conversion debt to be deemed nondischargeable, the creditor must show the debtor not only intended the conversion but also the debtor knew a transfer of the property was wrongful

10

and certain to cause financial harm to the creditor. *See* Farmers State Bank v. Diel (In re Diel), 277 B.R. 778, 783 (Bankr. D. Kan. 2002) (citations omitted).

### III. Application

Plaintiffs contend Defendant misappropriated funds in the amounts of $730,000.00, $513,426.10, and $373,000.00, and the conversion was willful and malicious.

#### a. $730,000.00 Transfer

On September 10, 2007, Defendant withdrew $730,000.00 of the Limited Partnership Fund investment proceeds and deposited the same into his and his wife's personal bank account. Defendant used the money to cure his Michigan condominium mortgage default and to purchase, in Sea Jay's name, Marietta property Sea Jay then leased to SCM for use as its headquarters. Were it not for this money, neither Defendant nor the Second Chance Entities would have had enough money to cure Defendant's mortgage default and purchase the Marietta property.

The Court finds Plaintiffs have proved by a preponderance of the evidence there is no genuine issue of fact Defendant committed conversion when he misappropriated $730,000.00 of the Limited Partnership Fund's investments for his personal use. Because Defendant employed the funds for a personal purpose, i.e. to pay off his condominium mortgage default and to purchase property for one of his businesses, an award of treble damages is permitted under Michigan law. The Court concludes trebling damages is appropriate in this case. Defendant intentionally withdrew money from the Limited Partnership Fund and deposited the funds into his personal accounts. The amount of money transferred shows the Debtor knew his actions were substantially certain to cause injury to the investors in the Limited Partnership Fund. Even if Plaintiffs knew money was being invested in the Second Chance Entities and Sea Jay, under no circumstances would they know or expect the funds to ultimately end up in the Defendant's pocket. The

11

Defendant's acts were also malicious. No valid purpose existed for the withdrawal of the funds, and the withdrawals were wrongful under the Limited Partnership Agreement. The Court concludes the Defendant's acts were malicious because they were wrongful and without just cause.

The Court concludes Plaintiffs are entitled to recover $730,000.00 as a result of Debtor's conversion of funds from the Limited Partnership Fund bank accounts. The Court also finds this sum should be trebled. Because the debt was incurred by willful and malicious injury, the Court finds the trebled sum, $2,190,000.00, is nondischargeable pursuant to section 523(a)(6).

### b. $513,426.10 Transfer

In 2008, Dixon told Defendant he needed funds to complete the construction of his new home in Atlanta, Georgia, and Dixon asked Defendant to make payments on his behalf to construction contractors. Dixon and Onyx Capital transferred money from the Limited Partnership Fund to the Second Chance Entities purportedly for investment purposes. Defendant knew the money came from Limited Partnership Fund investors. Defendant then transferred the money from the Second Chance Entities to Sea Jay, which issued checks to pay Dixon's construction contractors. Between October 2008 and December 2008, Defendant wrote checks from Sea Jay's accounts totaling $513,426.10 to three construction companies that performed work on Dixon's house. Defendant completed the favor because Dixon had invested money in Defendant's companies. Defendant previously testified he had no reservations when he was asked to make the payments. He further stated he transferred the money from the Second Chance Entities to Sea Jay's accounts to issue the checks so the payments would not appear improper. After the transfers, and after the SEC started investigating the Limited Partnership Fund, Defendant executed documents to show Sea Jay had purportedly owed a debt to Dixon at the time of the transfers.

The Court finds Plaintiffs have proved by a preponderance of the evidence there is no genuine issue of fact Defendant committed conversion when he misappropriated $513,426.10 of the Limited Partnership Funds and delivered the funds to Dixon's contractors. No proper purpose existed to use investor's funds to build Dixon's house. Moreover, Defendant's actions were willful – he intentionally and deliberately withdrew funds received from the Limited Partnership Fund to pay Dixon's construction contractors. Defendant did not passively accept Dixon using money from the Limited Partnership Fund to construct his home; rather, he actively funneled funds he knew were investor funds through his businesses to Dixon's contractors. Debtor's acts were also malicious because they were wrongful and without just cause. Defendant transferred a large sum of money from investors, over half a million dollars, and he did so without reservations. He also knowingly structured the transactions to avoid suspicion by obscuring the source of the funds. He actively aided in the concealment of the converted property.

The Court concludes Defendant's conversion of $513,426.10 was willful and malicious. Moreover, trebling the damages is appropriate and the trebled sum, $1,540,278.30, is nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code.

### c.  $373,000.00 Transfer

Plaintiffs allege Defendant converted funds by withdrawing $373,000.00 from Sea Jay and Second Chance Motor accounts and delivering the cash to Dixon, who in turn transferred the cash to the Limited Partnership Fund. The record shows, in December 2008, Defendant made several withdrawals from his Sea Jay and Second Chance Motor accounts. Defendant went to several different banks on different dates and withdrew a total of $373,000. He then personally gave the cash to Dixon, who in turn transferred the cash to the Limited Partnership Fund. Defendant believed all of the cash he withdrew during this period came from the Limited Partnership Fund,

thereby repaying the Limited Partnership Fund with its own money.

The Court finds Plaintiffs have proved by a preponderance of the evidence there is no genuine issue of fact Defendant committed conversion when he withdrew $373,000.00 from Sea Jay and Second Chance Motor accounts and delivered the cash to Dixon. Defendant effectively gave the Limited Partnership Fund's cash to Dixon to cover his prior embezzlement of funds. The Court finds Defendant acted willfully when he intentionally withdrew money he knew came from the Limited Partnership Fund to give to Dixon. Though repayment of funds to the Limited Partnership Fund could suggest Defendant did not intend injury, the Court concludes the amount of money transferred, the frequency of the transfers, and the fact Defendant provided cash to Dixon so as to obscure the source of the funds shows Defendant knew his actions were substantially certain to cause injury to the investors in the Limited Partnership Fund. Defendant also acted maliciously. To prove maliciousness, Plaintiffs need not show the Defendant intended ill will toward the Limited Partnership Fund investors, just the act was wrongful and without just cause or excessive. The Court finds there was no basis for the withdrawal of the funds and payment to Dixon, the withdrawals were wrongful under the Limited Partnership Agreement, and the withdrawals were excessive given the large sum of cash withdrawn and the frequency of the withdrawals. Defendant's actions aided Dixon in concealing his prior embezzlement. Accordingly, the Court concludes Defendant's acts were malicious because they were wrongful and without just cause and excessive.

The Court finds Defendant's conversion of $373,000.00 was willful and malicious. The Court concludes trebling the damages is appropriate, and the trebled sum, $1,119,000.00, is nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code.

14

### IV. Conclusion

Plaintiffs have proved by a preponderance of the evidence there are no genuine issues of fact with respect to their claims Defendant converted Limited Partnership Funds, the conversion damages should be trebled, and the total debt is nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code. The Court grants summary judgment in favor of Plaintiffs on their section 523(a)(6) claim. Accordingly,

**IT IS ORDERED** that the Motion is **GRANTED**.

**IT IS FURTHER ORDERED** that the debt totaling $**4,849,278.30** is owed to Plaintiffs and is excepted from discharge pursuant to section 523(a)(6) of the Bankruptcy Code.

The Clerk's Office shall serve a copy of this Order on Plaintiffs, Plaintiffs' counsel, Defendant, and the United States Trustee.

**END OF DOCUMENT**